Filed 8/29/14  Ervin v. Ben-Nun CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| JOHN L. ERVIN,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>MICHAL BEN-NUN,<br><br>    Defendant and Respondent. | D064236<br><br><br>(Super. Ct. No. 37-2012-00102850-CU-NP-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Joel M. Pressman, Judge.  Affirmed.

John L. Ervin, in pro. per., for Plaintiff and Appellant.

Godes & Preis, Robert M. Dato, Joseph M. Preis, and Oliver B. Dreger, for Defendant and Respondent.

John Ervin brought tort claims against his former wife, Michal Ben-Nun, alleging she falsely accused him of threatening to harm her and their young children before and during the couple's dissolution proceeding.  The court granted Ben-Nun's anti-SLAPP

motion, and entered judgment in Ben-Nun's favor. (Code Civ. Proc., § 425.16 (§ 425.16).)

Ervin does not challenge that the anti-SLAPP statute governs his claims, but contends the court erred in finding he did not meet his burden to show a probability of prevailing on three of his causes of action: malicious prosecution, intentional infliction of emotional distress, and defamation. We reject these contentions and affirm the judgment.

FACTUAL AND PROCEDURAL SUMMARY

Because of the nature of the legal issues raised by the parties, we set forth the factual background in some detail. Our factual summary is based solely on the facts contained in the appellate record. Because Ben-Nun did not object to Ervin's evidence, we assume the admissibility of Ervin's evidence for purposes of this appeal. We include a discussion of the evidence presented by both parties, but resolve evidentiary conflicts in Ervin's favor when ruling on the probability-of-prevailing issues.

*Background*

Ben-Nun and Ervin were married in 1999, and have three young children. On August 26, 2011, the family and Ervin's mother were on a vacation in Simi Valley. After checking into a hotel, Ben-Nun and Ervin had a heated argument. The parties dispute precisely what was said during the argument, but it is undisputed that the family left the hotel immediately after the argument without staying overnight and returned to their home in San Diego.

2

According to Ervin, the next day Ben-Nun appeared depressed and was rude to him. During the day, Ben-Nun left the children with Ervin (and his mother) while Ben-Nun went shopping. When Ben-Nun returned, she called her friends, Christina and Frederick Kamme, and told them about "the incidents in Simi Valley," and that she would like them to come to the house and "try to talk" to Ervin. Mr. Kamme later came over to speak with Ervin. According to Ervin's mother, Mr. Kamme concluded that nothing was "wrong" with Ervin.

The next day, on August 28, the couple continued to have emotional arguments. Ben-Nun suggested that Ervin agree to go to counseling, but he refused. Ervin told Ben-Nun he wanted their youngest daughter to attend a Christian preschool rather than her Jewish preschool, and if Ben-Nun did not agree, he wanted a divorce. These comments triggered a "hysterical," emotional reaction by Ben-Nun. Ben-Nun called her neighbor, Caroline Levenberg, who is an attorney specializing in the representation of minors. Ben-Nun told Levenberg that Ervin had threatened the family while they were on vacation and she was scared. After speaking with her husband (who is a police detective), Levenberg advised Ben-Nun to call the police.

Levenberg then spoke with another neighbor, Brenda Daly, a deputy district attorney with substantial expertise in mental health issues. Levenberg told Daly that "[Ben-Nun] had contacted her, and she was very afraid and very worried because [Ervin] had threatened to kill them and the kids and then was acting still crazy in the morning. . . . " Daly agreed that Ben-Nun should call the police.

3

Shortly after, Ben-Nun took her children to a neighbor's home and called the police department. Ben-Nun told the responding police officer that two days earlier while on their vacation Ervin had made threats to harm her and two of the children. Ben-Nun said Ervin told her (in the children's presence) that he would get a gun and shoot her and the children. Ben-Nun said she did not believe Ervin would hurt the children and he had never physically abused her, but that Ervin has a temper and had been behaving erratically. The police officer also spoke with two of Ervin's children. Ervin's daughter said: "My mom and dad were arguing in the hotel room. My dad told us he was going to shoot all of us. He was mad at all of us for ruining his vacation." Ervin's son said: "We were in the hotel room and my dad got mad at my mom. He said if we were not better the next day he would shoot us all. He was shouting at us when we got back to San Diego . . . ." The officer recorded all of these statements in his police report prepared later that evening.[1]

The police officer initially told Ben-Nun he did not intend to take any action. In response (while the officer was still there), Ben-Nun called neighbor Daly (the deputy district attorney) and asked what she should do because she was " 'worried' " and " 'really scared.' " Daly responded " 'You need to . . . be very honest with the police officer. Tell him everything that happened. Tell him that you are afraid. Tell him all of the things that you're feeling. What you're telling me you need to tell him.' " At Ben-Nun's urging, Daly then briefly spoke with the police officer. Daly told the officer: " '[A]ll I know is

---

[1]     We reject Ervin's evidentiary objections to the admissibility of the police report; however, we do not consider the children's hearsay statements for the truth of the matter.

4

what [Ben-Nun] told me. What she's telling me is that she's afraid and that he threatened to kill her and the kids.' " Daly advised the officer to question Ben-Nun and reach his own assessment, and suggested the possibility of issuing an emergency protective order if the officer believed this was necessary.

After further consideration and without first speaking with Ervin, the officer telephoned a superior court judge to apply for an emergency protective order. Based on the information provided by the police officer, the superior court judge authorized the police officer to issue the order requiring Ervin to stay away from Ben-Nun and the children on a temporary basis. The officer advised Ben-Nun to seek a more permanent protective order from the court. According to the officer's police report, when the officer later served Ervin with the written emergency order, Ervin made a "spontaneous statement" admitting he had made a threatening comment to Ben-Nun in Simi Valley. As recorded in the police report, "Ervin [told the police officer] 'I asked my wife if she would be happier if I killed all of us.' " In his anti-SLAPP declaration, Ervin denied making this statement to the police officer.

*Dissolution and Protective Order Proceedings*

The next day, Ben-Nun petitioned for a temporary restraining order against Ervin under the Domestic Violence Protection Act (DVPA). (Fam. Code, § 6200 et seq.) In a supporting declaration, Ben-Nun stated that on August 26, Ervin "complained that the children and I were ruining his vacation. Then, in front of all three children and me, [Ervin] angrily threatened us by saying 'One day I will take a gun and shoot all four of you.' " She said, "[t]he children and I were scared as [Ervin's] anger level increased."

5

Ben-Nun said that when they returned to San Diego, Ervin engaged in actions that made her "nervous" so she called friends and neighbors to attempt to calm Ervin down and urge him to see a counselor. She stated that Ervin previously said he would "kidnap the two older kids" and he has "thrown objects at doors and has broken the door." She also said that Ervin once punched their oldest daughter in the forehead when she was in bed.

The court issued the temporary restraining order, and scheduled a hearing for a permanent protective order. The next day, Ervin filed a dissolution action against Ben-Nun.

During the next week, the parties' counsel engaged in negotiations, resulting in a supervised visitation schedule for Ervin and the parties' agreement to participate in private mediation. As part of this negotiation and at the recommendation of her attorney, Ben-Nun agreed to dismiss her DVPA petition, and she did so on September 9.

The next day, Ervin returned to the family home, but the couple continued to have verbal disagreements. Neighbor Daly witnessed Ervin yelling at Ben-Nun while Ben-Nun was standing outside, and Daly believed Ervin appeared "unstable" and that "something [was] not right with him."[2] Daly said that his demeanor "was more than somebody that was just angry . . . ."

_____

[2]    Daly said she is "one of the lead people in [the district attorney's] office for all of the mental health cases. . . ." and has 15 years of experience in this area.

An anonymous individual[3] contacted the child protection agency (Child Welfare Services (CWS)), expressing concern for the children. An agency social worker, Aaron Meng, interviewed Ben-Nun and the children, and during the interview Ben-Nun disclosed Ervin's threatening statements.

On that same day, Ervin signed a written stipulation agreeing to mediate custody issues. A few hours later, Ervin received a call from social worker Meng. According to Ervin, Meng said there "has been a complaint that [Ervin] had committed child abuse against [his] children because [Ervin] threatened them in Simi Valley . . . and . . . Ben-Nun would be leaving the house with them . . . ." Ervin said he "asked Mr. Meng many times if there were any other allegations and he told me there were not."

Four days later, on September 19, Ben-Nun filed a second DVPA petition. Ben-Nun discussed Ervin's August 26 threat and said that Ervin's "behavior . . . has grown increasingly unstable" and "erratic" and "I believe he has lost all control. I feel completely misle[d] by [Ervin's] representations through his counsel which made it seem like we could peacefully resolve the custody issues with private mediation." She expressed concern for her own safety, and said that a school counselor has reported that their older 11-year-old daughter "feels unsafe at home" and that her dad has been "telling her horrible things about her mother . . . ." Ben-Nun also said their nine-year-old son told her "that his legs wobble every time [Ervin] shouts at [Ben-Nun]," and that when Ben-

3    The record does not disclose the identity of the anonymous individual, but according to Ervin it was a staff member of the Jewish Family Services (a mandated reporter) with whom Ben-Nun spoke to obtain assistance with family conflict issues.

7

Nun's attorney raised this issue with Ervin's counsel, Ervin responded by "confront[ing]" his son about disclosing this information.

In his response to the DVPA petition, Ervin disputed that he was "out of control" since returning home, but he did not deny that he and his wife had a highly emotional and angry argument during their Simi Valley trip and did not deny making an "irresponsible" statement to his wife during the argument. In a lengthy explanation (discussed in more detail below) he indicated the statement—when viewed in context—was not a threat, and that Ben-Nun did not feel threatened and understood the remark was merely "bluster" and not serious.

The court granted a temporary restraining order, and then later scheduled a January 2012 hearing on the contested motion for a permanent protective order. Soon after, CWS notified Ervin that it had found Ben-Nun's claims to be unsubstantiated and terminated the investigation.[4]

During the next several months, the family court handled matters regarding custody and visitation as part of the dissolution proceeding. At her deposition, Ben-Nun said she would prefer to have sole physical custody of the children, but understood the professionals would be deciding the custody issues and made clear that she intended to follow those recommendations.

---

[4]     This finding is based on Ervin's hearsay statement; other information indicates that the agency found some allegations unsubstantiated and some inconclusive.

8

In mid-January 2012, Ben-Nun dismissed her DVPA petition, stating the children were "visiting with dad regularly" and she was "following [the] recommendation of minor's counsel [and the] children's therapist."

Ten months later, in November 2012, the family court held a hearing regarding custody issues. At the hearing, Ervin (representing himself) cross-examined Ben-Nun extensively about her assertions that he had made a threat in Simi Valley, and questioned why she had waited two days to report the alleged threat. Ben-Nun responded that she had hoped things would become more relaxed, but two days later, "I just felt that everything [was] spiraling out of control and you were not controlling your actions." She said that Ervin was yelling in German, and the "kids were terrified . . . ." She testified that the morning before she called the police, Ervin was acting erratically, "running around in the house, taking keys. . . [¶] . . . [¶] . . . going through drawers in the house looking for passports." At that point, she asked him to go to counseling, but he "starting yelling . . . 'How dare you ask me to go to a counselor? . . . . I'm a scientist. . . . How could a counselor understand what a scientist thinks?"[5]

At the conclusion of the family law hearing, the family court found Ben-Nun "made the allegations to [CWS] in good faith." The court also denied Ervin's request that it make an affirmative finding that there was no child abuse. The court noted that all parties have now agreed that the August/September 2011 events would not affect the resolution of custody/visitation issues for or against either party.

---

[5] This transcript was submitted by Ervin in opposition to the anti-SLAPP motion.

*Complaint*

In August 2012, while the custody issues were being litigated in the family court, Ervin filed a complaint against Ben-Nun alleging several causes of action, including malicious prosecution, intentional infliction of emotional distress, and defamation per se.[6] Each of the causes of action was based primarily on Ervin's assertion that Ben-Nun falsely accused him of threatening to harm the family during their August 2011 vacation, and that this accusation interfered with his relationship with his children, resulting in severe emotional distress and harm to his reputation in the community.

In the malicious prosecution claim, Ervin alleged Ben-Nun prosecuted the two DVPA petitions without cause and in bad faith, and caused Ervin substantial emotional distress and monetary damages. In the emotional distress claim, Ervin alleged Ben-Nun engaged in "outrageous, reckless act[s]," including "recruit[ing] numerous third parties to have Mr. Ervin found a child abuser" and making false allegations in an effort to "remove Mr. Ervin from the lives of his three children." He alleged Ben-Nun made these false allegations to police officers, court officials, friends, neighbors, and school officials. In the defamation claim, Ervin alleged that Ben-Nun falsely told numerous individuals that he was a "domestically violent child abuser" and that he "committed crimes of moral turpitude like domestic violence and/or child abuse . . . ." He also alleged Ben-Nun

---

6    Ervin also asserted an abuse of process claim, and additionally sued Ben-Nun's attorneys. However, because Ervin does not challenge the abuse of process ruling or the judgment in favor of the attorneys, we omit a discussion of these claims and parties here.

10

falsely told the children's piano teacher that the children's music lessons need to be canceled because he has not paid child support.

*Anti-SLAPP Motion*

Ben-Nun moved to dismiss the complaint under the anti-SLAPP statute, contending the claims arose out of her constitutionally protected speech and petitioning activities. (§ 425.16.) On the probability of prevailing issue, Ben-Nun submitted various documents, including: (1) her declaration in which she stated that she filed the initial protective order petition "in response to a threat from [Ervin] that he was going to get a gun and shoot our entire family"; (2) the police report and emergency protective order containing statements made by the parties on the evening of August 28 (as summarized above); (3) her declaration in support of the second DVPA petition that discussed the reasons she was afraid of Ervin; and (4) Ervin's declaration opposing this second DVPA petition.

In the latter declaration, Ervin said he has "never threatened to harm anyone," but acknowledged that he and Ben-Nun had a heated argument in Simi Valley on the evening of August 26. Ervin elaborated: "[Ben-Nun] and I have both been feeling a higher level of stress than usual and have allowed the temperature of our rhetoric to rise to an unreasonable degree. We are here because words were said, which should not have been said: to each other, to the children, to the police and to the court. . . . [¶] Specifically, on August 26, after a trying day travelling in Malibu and Simi Valley with my wife, three children and my 75 year old mother Elfriede, I made an *irresponsible* comment which is being understood out of context. . . ." (Italics added.) Ervin said he "had no intention of

11

trying to create fear [or] harming anyone"; he "never threatened to harm anyone"; and he made the comment in reference to Ben-Nun's prior suicide attempt 10 years earlier. He said that Ben-Nun "knew the statement in Simi Valley wasn't a threat, but the children have become scared. Whether it is because of *that statement*, or because they were interviewed by the police and child services, or because they have been forcibly separated from their father twice, or because they know their parents are divorcing is difficult to know . . . ." (Italics added.) Ervin said that "even with the stress from the trip . . . *and the comment in Simi Valley*, we had kept things generally together. That was, until two days after we returned from Simi Valley . . . . [¶] My request to change [the youngest daughter's] school set off a chain of events with [Ben-Nun] . . . . In Simi Valley she knew my comments were bluster. *Unfortunate, irresponsible, but not meant as a threat*." (Italics added.)

### Opposition to Anti-SLAPP Motion

In opposing the anti-SLAPP motion, Ervin argued the statute did not govern his complaint, and even if it did, he could show a probability of prevailing on each of his claims.

In support, he proffered his own declaration in which he denied making any threatening statement on the evening of August 26, and stated that Ben-Nun gave no indication that she felt threatened on that evening or the next day. Ervin said that two days after they returned from their trip, Ben-Nun called the police in direct response to his informing her he would file for divorce if she did not agree to transfer their child from her Jewish preschool. He denied he told the police officers that he had made a

12

threatening statement to Ben-Nun. He said the officers "did not take my statement, nor did they ask my side of the story or ask any other questions of me." He said "Ben-Nun's representation to the police officer and to the Family Court . . . that I in any way threatened her or the children with physical violence is not true. I never said I would get a gun and shoot her and the children, nor did I say anything else which may have been reasonably construed as a threat."

Ervin further declared that he does not own a gun; has never owned a gun; loves his children; has been actively involved in their care since they were born; has never physically harmed his wife or children; has never done anything to make his wife or children believe he was going to physically harm them; and did not sign a settlement agreement vacating the two restraining orders. Ervin additionally stated that the CWS investigation found the child abuse claims to be "unsubstantiated." Regarding his claimed emotional distress, Ervin said his separation from his children caused him to lose weight and precluded him from sleeping. He also claimed he has been shunned by his neighbors, friends, and school officials.

Ervin also produced the declaration of his mother, who generally supported Ervin's version of the events and said that Ervin always acted appropriately with his family. His mother acknowledged, however, that Ben-Nun told her on August 26 while they were still in Simi Valley that Ervin "had threatened to get a gun and shoot all of them."

Ervin also proffered the transcripts of the depositions of Ben-Nun and numerous other individuals, including neighbors and the CWS workers. The deposition transcripts included in the appellate record are excerpts of the depositions of Ben-Nun and neighbor

13

Daly. Ervin also submitted telephonic records in an attempt to show Ben-Nun did not report his alleged threat until after the couple had the argument about their daughter's preschool. Ervin also raised evidentiary objections to various documents, including the August 28 police report and the statements contained within the report.

*Court's Ruling*

After considering the parties' submissions and conducting a hearing, the court found all of Ervin's causes of action were subject to the anti-SLAPP statute and Ervin did not meet his burden to show a probability of prevailing on these claims. The court did not specifically rule on Ervin's evidentiary objections.

DISCUSSION

I. *Legal Standards Governing Anti-SLAPP Motions*

Under section 425.16, a court "shall" grant a defendant's motion to strike a cause of action "arising from" an act "in furtherance of" the defendant's constitutional petition or free speech rights unless the plaintiff establishes a probability of prevailing on the claim. (§ 425.16, subd. (b)(1).) To promote participation in matters of public significance, courts must construe this statute "broadly" in favor of the moving party. (§ 425.16, subd. (a).)

In ruling on an anti-SLAPP motion, the trial court engages in a two-step process. (*Taus v. Loftus* (2007) 40 Cal.4th 683, 703.) First, the court must decide whether the defendant has met its burden to show the challenged cause of action is one arising from constitutionally protected activity as defined in the statute. (*Equilon Enterprises v. Consumer Cause*, *Inc.* (2002) 29 Cal.4th 53, 67.) Second, if this showing has been made,

14

the court must determine whether the plaintiff has met its burden to show a probability of prevailing on the claim. (*Ibid*.)

On appeal, Ervin does not challenge the court's conclusion that his claims arose from protected activity, and argues only that the court erred in ruling that he did not meet his burden to show a probability of prevailing on his claims. To satisfy this burden, Ervin was required to " ' "demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited. . . ." ' " (*Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 273.) Although " ' "the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim." [Citation.] In making this assessment it is "the court's responsibility . . . to accept as true the evidence favorable to the plaintiff. . . ." [Citation.] The plaintiff need only establish that his or her claim has "minimal merit". . . .' " (*Id*. at pp. 273-274.)

An appellate court engages in the same analysis as the trial court and must apply a de novo review standard. (See *Annette F. v. Sharon S*. (2004) 119 Cal.App.4th 1146, 1159.)

## II. *Challenge to Court's Written Explanation of its Ruling*

As a centerpiece of his appellate arguments, Ervin contends the trial court erred in failing to consider his own evidence and improperly focused only on Ben-Nun's evidence. This argument is not a basis for reversal. Even assuming the court erred in

15

making certain credibility and other factual determinations in Ben-Nun's favor, we are not bound by the court's findings and conduct an independent review of the entire record. "If the trial court's decision is correct on any theory applicable to the case, we affirm the order regardless of the correctness of the grounds on which the lower court reached its conclusion." (*Robles v. Chalilpoyil* (2010) 181 Cal.App.4th 566, 573.) As explained below, we have conducted an independent review of the appellate record, and we determine that—when viewing all the admissible evidence in the light most favorable to Ervin—he did not meet his anti-SLAPP burden to show a probability of prevailing on any of the challenged causes of action.

### III. *Malicious Prosecution*

#### A. *Legal Principles*

To establish a malicious prosecution claim, the plaintiff must prove the prior action was (1) brought (or continued) without probable cause; (2) initiated with malice; and (3) pursued to a legal termination in his or her favor. (See *Zamos v. Stroud* (2004) 32 Cal.4th 958, 965; *Padres L.P. v. Henderson* (2003) 114 Cal.App.4th 495, 513.) Additionally, even if these elements can be proved, certain types of actions cannot serve as the basis for a malicious prosecution claim as a matter of law. Two are of particular relevance here.

First, a malicious prosecution claim is not a remedy for actions arising from family law matters. (*Begier v. Strom* (1996) 46 Cal.App.4th 877, 885-888 (*Begier*).) There is an "absolute bar [on] malicious prosecution claims based on *any* kind of family law motion or [order to show cause]." (*Bidna v. Rosen* (1993) 19 Cal.App.4th 27, 34 (*Bidna*); accord

*Robert J. v. Catherine D.* (2009) 171 Cal.App.4th 1500, 1525; *Begier, supra*, at pp. 887-888.) This "bright line" rule seeks to prevent the particular "bitterness" in family law proceedings from escalating unnecessarily and to preclude civil courts from having to engage in the difficult task of assessing credibility outside the context of the family law proceeding. (*Bidna, supra*, 19 Cal.App.4th at p. 35.) The rule is also premised on the availability of remedies within the family law matter to address issues when parties assert false claims maliciously and without probable cause. (*Ibid.*) The most effective response to egregious or bad faith conduct "is for the family law bench to nip it in the bud with appropriate sanctions, not to expand tort liability for malicious prosecution to the family law bar." (*Id.* at p. 30; see Fam. Code, § 3027.1, subd. (a) [authorizing monetary sanctions on a person who knowingly makes a false accusation of child abuse or neglect in a child custody proceeding]; *Robert J. v. Catherine D., supra*, 171 Cal.App.4th at p. 1525.)

Second, a malicious prosecution claim "may not be based upon an unsuccessful civil harassment petition." (*Siam v. Kizilbash* (2005) 130 Cal.App.4th 1563, 1567 (*Siam*).) The *Siam* court explained that the civil harassment statutes provide a prompt and expeditious remedy for a victim who claims he or she has been threatened or harassed, and "[p]ermitting a malicious prosecution claim to follow an unsuccessful [civil harassment] petition would frustrate this streamlined procedure" and potentially dissuade harassment victims from seeking relief. (*Id.* at p. 1573; see Code Civ. Proc., § 527.6; *Robinzine v. Vicory* (2006) 143 Cal.App.4th 1416, 1422-1424.)

17

B. *Analysis*

Under these legal principles, Ervin's malicious prosecution claim fails for several reasons.

First, Ervin's malicious prosecution allegations were based on Ben-Nun's filing the two petitions seeking DVPA protective orders. These petitions were brought in connection with the disputes that were before the court in the family law proceeding. Accordingly, they cannot support a malicious prosecution action as a matter of law. (See *Begier, supra*, 46 Cal.App.4th at pp. 885-888; *Bidna, supra*, 19 Cal.App.4th at pp. 34-39.)

Second, for purposes of a malicious prosecution claim, the DVPA petitions were analogous to petitions seeking protective orders under the civil harassment statutes. Based on the same public policy reasons, the filing of a DVPA petition cannot form the basis for a malicious prosecution action. (See *Siam, supra*, 130 Cal.App.4th at pp. 1571-1574; see also *Nakamura v. Parker* (2007) 156 Cal.App.4th 327, 335; *Robinzine v. Vicory, supra*, 143 Cal.App.4th at pp. 1422-1424.)

Third, Ervin failed to satisfy the favorable termination element of a malicious prosecution claim. Generally, "[a] voluntary dismissal is presumed to be a favorable termination on the merits . . . ." (*Sycamore Ridge Apartments, LLC v. Naumann* (2007) 157 Cal.App.4th 1385, 1400.) This presumption arises from the assumption that a party does not simply abandon a meritorious action once instituted. (*Ibid.*) However, "[a] dismissal resulting from negotiation, settlement, or consent is generally not deemed a

18

favorable termination of the proceedings." (*Minasian v. Sapse* (1978) 80 Cal.App.3d 823, 827, fn. 4.)

In this case, Ben-Nun's dismissals did not reflect that her DVPA petitions were terminated in Ervin's favor. Her dismissal of the first petition came after negotiations between the parties' counsel regarding private mediation and supervised visitation, and thus was akin to a settlement. In dismissing the second petition, Ben-Nun specifically stated she was following the advice of the minors' counsel and therapist. This advice that she no longer needed a protective order did not reflect that Ben-Nun's initial grounds for seeking the petition were groundless or were resolved in Ervin's favor.

In his appellate briefs, Ervin attempts to refocus his malicious prosecution claim by relying on Ben-Nun's statements to the police and child welfare services workers. However, the sole basis of the malicious prosecution claim alleged in the complaint was the DVPA petitions. In evaluating an anti-SLAPP motion, the pleadings frame the issues to be decided. (*Church of Scientology v. Wollersheim* (1996) 42 Cal.App.4th 628, 656.) The "court must consider whether the plaintiff has presented sufficient evidence to establish a prima facie case *on his [pleaded] causes of action. . . .*" (*Schroeder v. Irvine City Council* (2002) 97 Cal.App.4th 174, 184, italics added.) Section 425.16 does not permit a plaintiff to avoid an anti-SLAPP motion by filing amended pleadings.

Additionally, Ervin's new contentions are legally deficient. Ben-Nun's statements to the police officers and child welfare services workers cannot be the basis for a viable malicious prosecution action because neither of these communications resulted in a *prosecution* against Ervin. " '[M]alicious prosecution protects the personal interest in

19

freedom from unjustifiable *litigation*' " (*Asgari v. City of Los Angeles* (1997) 15 Cal.4th 744, 754, italics added), and therefore a necessary element of the tort is that criminal or civil proceedings were actually instituted against the party. (See *Imig v. Ferrar* (1977) 70 Cal.App.3d 48, 58-59; *Ferraris v. Levy* (1963) 223 Cal.App.2d 408, 412.)

With respect to Ben-Nun's statements to the police, no criminal charges were filed, nor was Ervin arrested. Under California law, a criminal prosecution is initiated by filing an accusatory pleading or issuing an arrest or bench warrant with specified information. (See Pen. Code, § 804.) Likewise, with respect to Ben-Nun's statements to the CWS social worker, there was no juvenile dependency action filed, and thus no dependency prosecution upon which to base a malicious prosecution action.

In support of his arguments, Ervin relies on *Lefebvre v. Lefebvre* (2011) 199 Cal.App.4th 696. However, the *Lefebvre* court addressed only the first prong of the anti-SLAPP statute. (*Id.* at pp. 702-706.) Additionally, in *Lefebvre* a criminal case *was* prosecuted against the husband based on the wife's false allegations of wrongful conduct, and the jury found in the husband's favor. (*Id.* at p. 700.) Here, there was no criminal action filed against Ervin and there was no similar favorable termination finding.

IV. *Remaining Tort Claims*

Ervin also challenges the court's findings that he did not meet his burden to show a probability of prevailing on his claims for intentional infliction of emotional distress and defamation. Because these claims are based on statements made immediately before and during the dissolution action, they raise issues whether the communications were protected by the absolute litigation privilege. (Civ. Code, § 47, subd. (b) (§ 47(b)).) We

20

thus address the privilege issues first. We conclude that some of Ben-Nun's challenged statements are absolutely privileged, but others are subject only to the qualified privilege based on the exception set forth in Penal Code section 11172 (§ 11172). We then address the issue whether Ervin met his burden to show a probability of prevailing on the two tort claims based on statements that are not subject to the absolute privilege.

## A. *Privilege Issues*

Generally, statements made during or in connection with a judicial proceeding are absolutely privileged. (§ 47(b).) This litigation privilege applies regardless of the existence of malice or intent to harm, and extends to all torts except for malicious prosecution. (*Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 29.) The privilege governs "not only testimony in court and statements made in pleadings, but also statements made prior to the filing of a lawsuit, whether in preparation for anticipated litigation or to investigate the feasibility of filing a lawsuit." (*Hagberg v. California Federal Bank* (2004) 32 Cal.4th 350, 361 (*Hagberg*).) The section 47(b) unqualified privilege also applies to statements made to police officers to report suspected criminal activity. (*Id.* at p. 355.)

This privilege " 'absolutely protects litigants and other participants from being sued on the basis of communications they make in the context of family law proceedings.' [Citation.]" (*Jacob B. v. County of Shasta* (2007) 40 Cal.4th 948, 956, quoting *Wise v. Thrifty Payless, Inc.* (2000) 83 Cal.App.4th 1296, 1302; *Begier, supra*, 46 Cal.App.4th at p. 882; *Nagy v. Nagy* (1989) 210 Cal.App.3d 1262, 1270.) "Any other rule would surely spawn a second layer of litigation between a former spouse or a spouse currently seeking

21

a dissolution whose goal it is to make his or her former partner's life miserable." (*Wise v. Thrifty Payless, Inc., supra*, 83 Cal.App.4th at p. 1302.)

Ervin seeks to avoid the section 47(b) litigation privilege bar by relying on section 11172. Section 11172 provides absolute immunity to mandatory reporters who report child abuse to proper authorities, but it provides only qualified immunity to voluntary reporters (including parents) who report child abuse. (See *Siam, supra*, 130 Cal.App.4th at pp. 1574-1578; *Begier, supra*, 46 Cal.App.4th at pp. 882-885.) Specifically section 11172 states: "No mandated reporter shall be civilly or criminally liable for any report required or authorized by this article . . . . Any other person reporting a known or suspected instance of child abuse or neglect shall not incur civil or criminal liability as a result of any report authorized by this article unless it can be proven that a false report was made and the person knew that the report was false or was made with reckless disregard of the truth or falsity of the report. . . ."

In creating this distinction, the Legislature sought to increase child-abuse reporting by immunizing mandated reporters while at the same time discouraging nonmandatory reporters (such as a vindictive spouse or neighbor) from making a knowingly false report and harming the reputation of the targeted individual. (See *Siam, supra*, 130 Cal.App.4th at pp. 1577-1578; *Begier, supra*, 46 Cal.App.4th at p. 885; see also *Hagberg, supra*, 32 Cal.4th at pp. 370-371, fn. 6.)

The courts have interpreted section 11172 as providing an exception to section 47(b)'s absolute litigation privilege if the communication: (1) was made by a voluntary reporter (such as a parent); (2) occurred outside the court proceeding; and (3) concerned a

22

child abuse report authorized under the Child Abuse and Neglect Reporting Act (Pen. Code, § 11164 et seq.). (See *Siam, supra*, 130 Cal.App.4th at pp. 1574-1578; *Begier, supra*, 46 Cal.App.4th at pp. 882-885; see also *Chabak v. Monroy* (2007) 154 Cal.App.4th 1502, 1515-1519.) With respect to the latter element, the covered communications include child abuse reports made to mandatory reporters or to agencies statutorily authorized to receive such reports, such as law enforcement agencies (Pen. Code, § 11165.9.) (See *Siam, supra*, 130 Cal.App.4th at p. 1578.) If these elements apply, there is generally an exception to the section 47(b) absolute privilege, and a qualified immunity governs the communication.

Under these standards, Ben-Nun's statements contained in petitions to the court (including the dissolution papers and her petitions seeking protective orders) are absolutely privileged under section 47(b). However, Ben-Nun's reports of child abuse made to certain third parties outside the judicial proceeding, including to a law enforcement officer and to the child welfare services worker, are not absolutely privileged. Instead, they are subject only to a qualified privilege.

### B. *Intentional Infliction of Emotional Distress*

To show a probability of prevailing on his intentional infliction of emotional distress claim, Ervin was required to produce evidence showing: " ' "(1) outrageous conduct by the defendant, (2) intention to cause or reckless disregard of the probability of causing emotional distress, (3) severe emotional suffering and (4) actual and proximate causation of the emotional distress." ' [Citation.]" (*Wong v. Jing* (2010) 189 Cal.App.4th 1354, 1376.) To satisfy the "outrageous" element, the defendant's conduct must have

23

been " ' " 'so extreme as to exceed all bounds of that usually tolerated in a civilized community' " ' . . . and . . . ' "of a nature which is especially calculated to cause, and does cause, mental distress." ' [Citation.]" (*Chang v. Lederman* (2009) 172 Cal.App.4th 67, 86-87.) " ' "It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." ' " (*Fowler v. Varian Associates, Inc.* (1987) 196 Cal.App.3d 34, 44 (*Fowler*).)

Ervin argues he satisfied the "outrageous" element based on evidence showing Ben-Nun made false statements that he had: (1) physically abused his oldest daughter by punching her in the head; and (2) threatened his children during the family vacation.

The first category of statements cannot serve as the basis for the tort claim because they are absolutely privileged. Based on the evidence in the appellate record, Ben-Nun made these statements *only* in her first DVPA petition and at her deposition. These statements are subject to the absolute litigation privilege because they were made within a judicial proceeding. (*Begier, supra*, 46 Cal.App.4th at p. 882 [section 11172 exception inapplicable to wife's alleged "false accusations within the dissolution action"].) In his appellate brief, Ervin argues that Ben-Nun also made the physical abuse allegations to the CWS social worker. However, his citations to the record do not support this assertion. There is no evidence in the appellate record that Ben-Nun made the physical abuse allegations to anyone outside the court proceeding. Thus, the section 11172 exception is inapplicable.

24

With respect to the second category of statements (Ben-Nun's statements about Ervin's alleged threat), we agree that some of those statements fall within the section 11172 exception, including to the police officer, CPS worker, and other mandated reporters. However, we conclude that even assuming the admissibility of these statements, Ben-Nun's conduct does not rise to the level of the "outrageous" behavior necessary to establish the tort.

The trial court serves as the gatekeeper for determining whether conduct is sufficiently outrageous to support a cause of action for intentional infliction of emotional distress. (*Fowler, supra*, 196 Cal.App.3d at p. 44.) This gate has a high threshold. As one court explained, in evaluating whether the defendant's conduct was outrageous, it is " 'not . . . enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " (*Cochran v. Cochran* (1998) 65 Cal.App.4th 488, 496.)

In his appellate brief, Ervin argues he met his burden to satisfy this "outrageous" element by relying on evidence that Ben-Nun told various individuals that he had threatened the family during their vacation and on his anti-SLAPP declaration in which he denied making any such threat. However, our analysis does not turn on the narrow issue whether Ervin did or did not make a specific threat to his wife during their Simi

25

Valley vacation. To determine whether Ervin's evidence is legally sufficient to satisfy his anti-SLAPP burden on the emotional distress claim, we are required to consider the totality of the circumstances, including Ervin's precomplaint declaration. In this declaration, Ervin admitted he and his wife had a heated and highly emotional argument in Simi Valley during which he made an "irresponsible" and "[u]nfortunate" comment to his wife, and that "words were said, which should not have been said." Ervin submitted evidence showing the children were in the room during this argument, and he proffered his mother's declaration who stated that within minutes after the argument, Ben-Nun told her about the threat. Ervin further acknowledged that shortly after checking into the hotel and engaging in this argument, the family immediately left the hotel and came home, and upon their return, the tension persisted and Ben-Nun remained "very depressed" and emotional. Ben-Nun's evidence (uncontradicted by Ervin) shows that during this time, Ervin continued to manifest considerable anger and erratic behaviors.

Viewed in this context, the fact that Ben-Nun called the police and consulted neighbors (who were legal professionals/mandatory reporters) in the midst of a highly volatile family situation was not sufficiently extreme and outrageous to support a cause of action for intentional infliction of emotional distress, even assuming one of Ben-Nun's claims may have been exaggerated and was not entirely accurate. Ervin argues that a factfinder could reasonably infer that Ben-Nun made those calls to gain an advantage with the upcoming custody issues. However, even if this was part of Ben-Nun's motivation, the undisputed record shows that the family was experiencing a difficult, conflict-ridden situation, and that Ben-Nun felt she needed help to resolve these

26

problems. Ben-Nun's allegedly false statement while seeking assistance under these circumstances was not the type of conduct that is so "atrocious" and "utterly intolerable" that it is protected by the emotional distress tort. Likewise, the fact that Ben-Nun's responses to the CPS inquiries included a discussion of her version of the Simi Valley events does not show outrageous behavior sufficient to support the emotional distress tort.

This result is also compelled by our state's public policy in favor of protecting children. The Legislature provided only a qualified immunity for nonmandated reporters filing false child abuse claims to protect the reputations of those who might be falsely accused. (*Begier, supra*, 46 Cal.App.4th at p. 885; § 11172.) But there is nothing in this legislation indicating an intent to expand the emotional distress tort beyond its traditional confines. If we were to conclude a party's communications about the children during (or immediately before) a dissolution action support an independent emotional distress claim, every dissolution proceeding involving such accusations could spawn such a claim, escalating the adversarial battles and causing continued hostility and added difficulties for the children. This result is contrary to public policy in this state, which seeks to contain dissolution disputes within the family court context.

Ervin's complaint alleges that Ben-Nun engaged in improper acts during a brief period—several days before Ervin filed his dissolution proceeding and within weeks after that proceeding was filed. The family court immediately became involved and made custody and other decisions involving the family. In so doing, the court specifically found that Ben-Nun made her accusations to the child welfare services "in good faith,"

27

and refused to make a factual finding that Ervin did not engage in the alleged inappropriate conduct. For Ervin to seek a contrary factual finding regarding this same conduct in an independent civil action for emotional distress damages would entitle him to a second hearing on the issue and could result in inconsistent factual determinations. Our judicial system disfavors such repetitive litigation, particularly in the family law context where children are involved.

Ervin's reliance on *Siam* is unhelpful. There, the parties to the civil action were the mother's new boyfriend (the plaintiff) and the mother's former husband (the defendant). (*Siam, supra*, 130 Cal.App.4th 1567.) Because the boyfriend was not a party in the family court, this dispute was not before the family court as part of the dissolution action. Moreover, in *Siam*, the plaintiff submitted evidence showing the defendant's former spouse "swore revenge" against his former wife, and that the former spouse had engaged in repeated abusive and hostile conduct against the plaintiff. (*Id.* at pp. 1567-1568, 1582.) As discussed above, the facts here are materially different.

*Begier* is also unhelpful on the issue whether Ervin met his anti-SLAPP burden to factually substantiate his claim. (*Begier, supra*, 46 Cal.App.4th 877.) The *Begier* court was a pleadings case, and addressed only the question whether a nonmandated reporter's filing of a police report concerning alleged child abuse is subject to an absolute (§ 47(b)) or a qualified (§ 11172) privilege. The court did not reach the issue whether the alleged facts supported an intentional infliction of emotional distress cause of action.

C. *Defamation Claim*

In his defamation cause of action, Ervin alleged that Ben-Nun falsely characterized Ervin "as a domestically violent child abuser" to "every family friend who would bother to listen to her," and these statements were made outside of the litigation.

In his appellate brief, Ervin argues the defamation consisted of Ben-Nun's statements that Ervin threatened "to shoot his children" and physically abused his daughter. To the extent the statements were made within the dissolution action, the statements are absolutely privileged and cannot be the basis of a tort action. (See *Begier, supra*, 46 Cal.App.4th at p. 882.) However, to the extent the statements were made outside of the litigation and fall within the section 11172 exception to the absolute privilege, we examine them to determine whether they support Ervin's defamation claim. (*Id.* at pp. 882-885.) Based on this analysis, we conclude Ervin did not meet his burden to show a probability of prevailing on his defamation cause of action.

First, truth of the challenged statements is a complete defense to a defamation claim. (*Raghavan v. Boeing Co.* (2005) 133 Cal.App.4th 1120, 1132.) "Minor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.' [Citations.] Put another way, the statement is not considered false unless it 'would have a different effect on the mind of the [listener] from that which the pleaded truth would have produced.' [Citations.]" (*Masson v. New Yorker Magazine, Inc.* (1991) 501 U.S. 496, 517; see *Gilbert v. Sykes* (2007) 147 Cal.App.4th 13, 28; *Ringler Associates Inc. v. Maryland Casualty Co.* (2000) 80 Cal.App.4th 1165, 1180-1181.) In determining whether a statement is defamatory, the court must consider

the context of the challenged statement and review the totality of the circumstances. (See *Balzaga v. Fox News Network, LLC* (2009) 173 Cal.App.4th 1325, 1337-1338.)

As discussed above, the statements made by Ben-Nun regarding the alleged threat were based on the undisputed facts that the couple had a heated and highly emotional argument during which Ervin later admitted making an "irresponsible" and "[u]nfortunate" comment to his wife. When the family returned home later that evening (even though they had planned to stay the night), their arguments continued and Ervin engaged in erratic behaviors causing Ben-Nun and the children to remain nervous and upset. In his declaration in opposition to Ben-Nun's protective order petition, Ervin attributed these arguments to "a higher level of stress than usual" which "allowed the temperature of our rhetoric to rise to an unreasonable level." He went on to say, "[w]e are here because words were said, which should not have been said: to each other, to the children, to the police . . . ." Although he later denied telling the police officer he threatened his wife in Simi Valley or that he asked her "if she would be happier if I killed all of us," his own description of the argument paints the picture of a highly volatile situation where angry, abusive words were exchanged.

Viewed in this context, Ben-Nun's statements to others that Ervin had verbally threatened her and the children was a substantially accurate description of the relevant events, even if Ben-Nun's version may have been exaggerated or embellished. The critical fact is that the substance of her statements was true. Indeed, after considering all of this evidence in the family law case, the family court judge declined Ervin's request to make a factual finding there had been no abuse, and found Ben-Nun had made the

30

statements about the threat in good faith.  Moreover, Ben-Nun's comments about her subjective feelings (that she was fearful of Ervin and was concerned for her own safety and that of the children) were opinions that cannot constitutionally support a defamation claim.  (See *GetFugu, Inc. v. Patton Boggs LLP* (2013) 220 Cal.App.4th 141, 156; *Moyer v. Amador Valley J. Union High School Dist.* (1990) 225 Cal.App.3d 720, 725-726.)  Considering the totality of this evidence, Ervin failed to show the "gist or sting" of the statements was untrue, and thus he cannot recover on his defamation claim.

Ervin's remaining arguments do not alter this conclusion.  In his appellate brief, Ervin emphasizes that in his anti-SLAPP declaration, he denied making any threatening statements to his wife.  However, as with summary judgment procedure, a party cannot create a prima facie factual basis for a claim if he or she has already made admissions that negate the claim's validity.  (See *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 21-22.)  Before filing this action, Ervin acknowledged in his protective order declaration that during the Simi Valley trip he had made an unfortunate and irresponsible statement to Ben-Nun and recognized that this statement was the likely source for Ben-Nun's later statements to others, including friends and neighbors.  This admission defeats Ervin's current claim regarding the falsity of Ben-Nun's challenged statements.

Ervin also contends that Ben-Nun's communications about his threats were inaccurate because Ben-Nun falsely stated Ervin made the threat in front of the children.  In support of this contention, Ervin relies solely on Ben-Nun's deposition testimony.  However, Ben-Nun's deposition testimony reflects that the children *were* in the room during the argument when the threats were made.  Although Ben-Nun testified that she

31

told her mother-in-law about the threat while she and the children were in a hotel elevator, Ben-Nun indicated that these young children had *already* heard the threat because they had been in the hotel room during the argument. A contrary conclusion cannot be reasonably inferred from Ben-Nun's testimony.

Ervin also contends his defamation claim is actionable based on Ben-Nun's statement contained in her initial motion for a protective order regarding Ervin's alleged physical abuse against their oldest daughter. However, as stated above, Ben-Nun's statement regarding this alleged physical abuse was made only in her DVPA court petition and her deposition testimony and therefore it is absolutely privileged and does not fall within the section 11172 exception. Thus, the statement cannot support a defamation claim.

We note further that as with the emotional distress claim, the defamation claim arises directly from, and is inextricably intertwined with, the allegations made in the couple's dissolution proceeding. Although accusations in divorce proceedings are often regrettable and exaggerated, this type of family dynamic is not uncommon as negative emotions are at a high level, objective thinking is at a premium, and the parties are all too inclined to take advantage of the other's vulnerabilities. To avoid escalating these emotional battles beyond reason, the public policy in this state seeks to contain dissolution disputes within the family court context. Family law judges have resources to help the parties resolve their differences, and where necessary, to impose monetary and other sanctions to effectuate compliance. Permitting Ervin's defamation claim to go forward violates this important public policy.

32

## V. *Evidentiary Objections*

Ervin contends the court erred in failing to rule on his evidentiary objections. Although the court does not appear to have ruled on Ervin's objections, Ervin has not met his appellate burden to establish prejudicial error. We may not reverse a judgment unless the complaining party demonstrates a miscarriage of justice. (Cal. Const., art. VI, § 13.)

The only evidentiary objection specifically discussed in Ervin's appellate brief is his challenge to the evidence that his children told the responding police officer about Ervin's threat to kill or shoot the family members. However, Ervin does not explain or develop his contentions challenging the evidence, or cite any relevant legal authority supporting his assertions. On these grounds, he has forfeited this contention. (See *Landry v. Berryessa Union School Dist.* (1995) 39 Cal.App.4th 691, 699.) Ervin refers us to his objections below, but it is improper appellate practice to incorporate by reference arguments from other documents, even if those documents are part of the appellate record. (See *Garrick Development Co. v. Hayward Unified School Dist*. (1992) 3 Cal.App.4th 320, 334.)

In any event, we have not considered the children's statements to the police officer for the truth of the matters asserted (the fact that Ervin made the threats). Instead, we consider the statements solely for the nonhearsay purpose to show the reasons the police officer acted as he did (e.g., issuing an emergency protective order and advising Ben-Nun to petition for a more permanent protective order).

Additionally, the August 28 police report is admissible evidence under the hearsay exception for official public records (Evid. Code, § 1280; see *Donley v. Davi* (2009) 180

Cal.App.4th 447, 461), and Ervin's statements recorded in the report are admissible for their truth under the party-opponent hearsay exception (see Evid. Code, § 1220). The official records hearsay exception is based on the presumption that public officers properly perform their official duties, and does not require that the public official testify about the preparation of the report. (See *Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 317-318; *Fisk v. Department of Motor Vehicles* (1981) 127 Cal.App.3d 72, 78-79.) The statutory elements for applying this exception were satisfied in this case.

Additionally, we deny Ben-Nun's request that we take judicial notice of Ervin's memorandum of points and authorities pertaining to Ben-Nun's attorney fees request. Because this document was filed in the superior court after Ervin filed his notice of appeal, it is not properly before us. (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3.)

DISPOSITION

Judgment affirmed. The parties to bear their own costs on appeal.

 

 

_____

HALLER, Acting P. J.

WE CONCUR:

 

_____

MCDONALD, J.

 

_____

MCINTYRE, J.

34